Good morning, your honors. Charles Fleischman appearing for the appellant. This is an ERISA case. This is our third time up before this court. I think the key issue in this case is the trial judge applied the wrong test for disability when she made her ruling. That was Judge Nguyen. She found that there was no proof that my client was permanently totally disabled and the plan does not call for permanent total disability. The second issue is... As I understood the policy, there is a definition of disability for purposes of the first 24 months and then a separate definition the following. Yes. In order to find him totally disabled, in order to obtain benefits after the initial two years which he was paid for, she would be looking at whether or not there was any type of employment that he could be retrained for even though it might be different from what he used to do at the law firm. Any type of employment that he is qualified to perform by reason of his background, education, training. Given his physical disability. Right. Okay, and you don't think she did that in her de novo review of the record? No. There was no evidence that there was another job he could perform. There was a vocational rehabilitation report, but that was done without taking into consideration all of the restrictions that were on him, even the restrictions that their own doctors found. But I thought the VEs and the physicians suggested that he might be capable of doing light or sedentary work so long as he could periodically change positions. No. The vocational report didn't even take that into consideration, the changing of positions. It all took into consideration, if you look at the report, is that he could not use. He was limited in the use of his hands. And that came from a. It didn't even mention the fact that he has to stand up or sit down or change position as required. It just took into consideration. If you look at the report itself. She. She conducted rather. This was after Judge Real had two shots. Yes. Yes. And then. Wasn't I on that panel? You were on the first panel. OK. And she totally disregarded everything that was that was in the first opinion. Yeah. OK. And she identified all the evidence in the administrative record that supported the conclusion that. I'm a Vic didn't meet the plan's definition of disabled, but she used the wrong definition. She's permanently, totally disabled. And she also misinterpreted the evidence. The evidence was based on Dr. Marion's report. Dr. Marion said that there's no herniated disc compression of the spine or anything wrong with him. And when, in fact, that all the MRIs and all the CTs and all the EMGs that were done showed that he had a herniated disc in his in his neck at two levels in his neck, causing severe stenosis and pressure on the nerves. And there was a herniated disc. I don't mean just bulging this. I mean, extruded nucleus pulposus in the low back and in the neck that were pressing on nerves. And there was a herniated disc in the mid back. And he completely the doctor that they relied on completely missed all of that. Also, that doctor's report was not given to us until after we filed the lawsuit, even though we asked for it twice, which is a violation of the rule in Staffon versus it's either Staffon or Saloma. I'm sorry. It's a violation of Saloma versus Honda, which is an arbitrary and capricious case. But still, we never even got to see that. I offered to she had a problem. The judge had a problem making a connection between his physical problems and his inability to work. But that was never an issue raised by the defense at any time prior to litigation. That was not one of the reasons that they that they denied the claim. And I realized that after the Mooney's case, there is no right to a full and fair review. If a denial of benefits is reviewed de novo. Still, we should have the right to present evidence on that issue if she's all of a sudden raising it. And it seems to me if a defendant it's arbitrary and capricious for a defendant or a plan to raise a new defense. After litigation begins, it certainly is for a district court judge to raise a new defense. Arbitrary and capricious for a new district court judge to raise the defense after litigation begins and not give us an opportunity to present evidence on that issue. And I asked for that opportunity. I made an offer of proof. Now, so what do we it appeared that the district court have relied pretty heavily on the report of Dr. Bernard Cooperman. Yes. July 15, 2002. Yes. And I'm looking at I guess it's E.R. 180. It's a page numbers pages. But the last page of his letter and under vocational rehabilitation, he says, it is my view that he can go back to work to 32 hours a week. From the orthopedic point of view as to whether his inability to work a full 40 hour per week is usual occupation makes him a qualified injured worker appears to be a legal question. And I think as I read Judge Wynn's order, she looked at Dr. Cooperman's opinion in concluding that there was work that he could do, although it might not be in a full time. Yeah, but he has to be able to work full time and not part time. Also, Dr. Cooperman's report, as you pointed out, was was in September 2002. His benefits after that report was written and after the insurance company had that report, they granted him disability benefits based upon the any occupation test, the harder test. And it wasn't until seven months later that they changed their mind. And that was already several years later. And Dr. Cooperman says that my client's condition is a degenerative condition and it's expected to spread to other joints other than the ones that were affected at that time. So we're talking. I think it was something like 17 months later. They could be nine months later. They give them the benefits. 17 months later, they cut it off. And and there was no evidence to base the cutoff. In fact, the doctor hadn't even reviewed the medical record when they cut it off for them. They had a nurse review the medical record. And she found that his complaints weren't severe enough to to to warrant him not being able to work. Dr. Marion, on the other hand, said that his complaints were all out of proportion to his physical findings. So in one case, you had you had them discontinue his benefits because he didn't complain enough. And in the other, he complained too much. So it was it was a no win position for him. I'd like to reserve the rest of my time unless you have any questions. Thank you. Good morning, Your Honor. My name is Russell Burner and Wilson Elser on behalf of the L.A. May it please the court. As counsel has noted, as the court is aware, over the past six years, we've had three trials on this matter. Two different two very different judges over those three times all found the plaintiff was capable of working in any occupation as defined in the policy. One of the key points to remember on this appeal is that the findings of fact are reviewed under a clearly erroneous standard. All of the arguments raised by appellant both in in briefing and before the court this morning are all factual issues. It is not raised any issue of law that is viewed under a different standard. Therefore, as long as there is the findings were plausible in light of the entire record, looking at it in light most favorable to the respondent, the court should uphold Judge Wynn's decision. Counsel, Judge Gould, if I could interject. Would the argument that she applied the wrong standard for disability, would that be a legal issue as opposed to factual? I'm sorry, Your Honor. I did not mean to interrupt. Go ahead. I don't believe so. I believe that that is purely an interpretation of looking at the terms of the policy and determining what the policy says and doesn't say. There was no legal argument presented to suggest that what she made was an error of law in determining what the terms of the policy were. There's no case law cited to argue that what she did was improper. It was solely a matter of her reviewing the policy, which is in the record, and which she quotes in her 18-page quite detailed findings of fact and conclusions of law. She cites correctly the definitions of disability, both prior to his termination of benefits and subsequent to the 24 months. I believe that in referencing the doctors, the plaintiff's doctors who were all involved in the workers' compensation case and who always talk in terms of TTD, total temporary disability, or permanent disability, and ratings for permanent disability over the time of life, that she simply at times misutilized the word that was in the definition. But she cites the definition, and she applies it correctly. She looks at the various records and determines what she did. And I would like to address a couple of those statements. As Judge Talman noted, Dr. Cooperman, who in that case was an agreed medical examiner, wasn't even from one side or the other in the workers' compensation case, indicated that he could work 32 hours per week at his previous job. At the time, they were looking at his regular occupation. And contrary to what Mr. Placement stated a moment ago as far as permanent versus temporary, excuse me, full-time versus part-time employment, in the definitions for any occupation disability after the 24 months, the insured has to be able to work in any gainful occupation. Then the definition of gainful occupation includes the ability to work on a part-time basis but chooses not to do so. That's at the excerpts of record at page 27, the piece from the policy that indicates that. So as long as he could work part-time, which Dr. Cooperman said he could in 2002 at his own occupation, then he would be found to not be disabled under the any occupation definition of disability. But he still has to be able to earn, what, 60% of his? No, Your Honor. Actually, the 60%, if you look at where the language in the policy is, only is in the section for regular occupation. That's the definition that says you have to be able to do the material and substantial duties of your occupation and earn 60%. In order to, I'm sorry, maybe I'm. During the first 24 months. During the first 24 months, if you can't do at least 60% of your old occupation. Of your earnings. Then you are temporarily disabled for that 24 months. Disabled for 24 months, but that is not. But thereafter, it's just any gainful occupation that you can be retrained to do. Correct. Okay. And with regard to his ability to do any occupation, counsel has suggested that the vocational rehabilitation specialist did her report and stated that based on the fact that plaintiff appellant could do sedentary occupation, but that there was no basis for that. However, immediately before that in the record, the excerpts of record page 84, Dr. Fagan, who was the in-house medical reviewer, actually states in a note that he is capable in the review that is related to the file by the claim examiner. It's a claim discussion note between the claim examiner and Dr. Fagan, and it notes that Dr. Fagan said he is capable of doing any said SED occupation for a sedentary. So the in-house doctor at that time said sedentary occupation, vocational rehabilitation specialist. Notes on page 85 is where her report is. The ability to not constantly use his hands and not define manipulation or repetitive keyboarding, she notes that in her report and then determines that there are several occupations that he is capable of doing under those tests. This is a de novo review case. As plaintiff has noted, since the Muniz opinion of this court, he's not entitled to a full and fair review under the regulations as they're not relevant. The same thing is true of the entitlement to review the doctor's report on appeal. That has come up. You've got that in the main decisions across the country have been the 8th, the 10th, and the 11th circuits. Those cases are Midgett, M-I-D-G-E-T-T, which is 561 F3rd 887, Metzger via Unum Life, 10th circuit, which is 476 F3rd 1161. There's Glazer out of the 11th circuit, which is 524 F3rd 1241. And then there are also a series of at least three district court cases from within the 9th circuit who have followed Midgett and their logic to find that on appeal, the insured is not entitled to obtain a copy of the medical review report before going forward, because as Metzger says, the opportunity to quote, the opportunity to review and rebut medical opinions generated on administrative appeal would set up an unnecessary cycle of submission, review, resubmission, and re-review. In the cases that have found, the district court cases that have found that, there is Fortledge versus Heller-Urman, which was at 2009 U.S. District Lexus 127846. Most recently Landis versus Intel Corp, 2010 U.S. District Lexus 94140. And there is also, those are both northern district cases. There's also a central district case, Wins, W-I-N-Z hyphen Bione, B-U-I-O-N-E versus Met Life, which was at 2008 U.S. District Lexus 109824, and that was affirmed by the 9th circuit on other grounds. In 2009 U.S. Appalachus 27587. Did you cite all those in your? No, because the court, because plaintiff raised more of that in his reply brief, but did not have the opportunity to address that. It would be very helpful to the court if you'd fill out a slip. Certainly. And if both your opponent and us. Would be happy to. Make sure we've got those. And similarly, because this is a de novo review, the concept of sandbagging in the cases cited by appellant are also inapposite, because the idea of sandbagging comes up in an abuse of discretion case, because whether it's the court or the claim administrator before then is being given discretion. There is weight being given to its decision ahead of time, and you don't allow anybody to sandbag, quote unquote, the plaintiff, because to do so would be unfair based on the discretion that is already being granted to the reviewer. In the case of the district court doing a de novo review, the court is no longer placing any reliance or any deference on the decision of the claim administrator, in this case prudential, but is instead reviewing the file anew. It's basically reaching a brand new decision based on the information and evidence that is in the file. So there's no such thing as sandbagging, because all of that evidence is there before the court was presented by the plaintiff, and all opportunities have been provided along the way. I also want to say something about the issue of objective evidence and objective data. I think that counsel is well aware of the difference between objective that there's a difference between objective evidence of the disease or the illness or the injury and objective evidence of how those injuries or illnesses provide restrictions or limitations that allow a plaintiff to stop working. There has been no argument at any point in this file, in any type of a claim or in any point of the district court's decision, that there is not objective evidence of things such as some degenerative disc disease, some radiculopathy, orthopedic issues such as those. What's not been found and what I think counsel understands the difference of is what there is not in the file. And there, except back in 2002, with Dr. Cooperman and his part-time decision, and before him, Dr. Shore, later in 2002, that indicate that there is something that he can't do because of these issues. We all understand that he, as well as other people, have degenerative disc changes, might have some carpal tunnel syndrome, but how does that restrict the plaintiff from the abilities of any sedentary occupation? Dr. Marion, plaintiff claims and asserts, is contradictory, but what he says after reviewing the files is not that he found no evidence of degenerative changes or herniated discs. His quote is, there is no significant herniated disc. There's quite a difference between claiming that he didn't find any and then calling him incorrect throughout the rest of his report. What he said is he didn't find any of them significant and then goes on to determine that the plaintiff's capable of doing sedentary activity. He also is, he is brought to task by appellant because he says that things were not based solely on self-reports. Again, that is true. The illness, the injury, the disc changes were not based solely on self-report. He acknowledges the MRIs and the x-rays, but what is self-reported is his pain and what he says he can't do. There has been no objective testing. Counsel doesn't believe in functional capacity evaluation, so that wouldn't have worked here, but no objective testing to show what he was and wasn't capable of doing based on these impairments or illnesses. If Your Honors have no other questions, I will sit down. I want to just ask you one question. Certainly, Your Honor. Do you have the definition of the word obnebulate? They asked that in, I think, our Muniz argument, and if I remember, it was something along the lines of very confusing. Cloudy. Cloudy. That sounds about right to me, Your Honors. M. Dispo was written by Judge Ferdinand Fernandez. He slips that in. A word that you have to go look at the dictionary. That was in the first appellate decision. That's correct. That was from the first appellate decision. Yeah, first appellate decision. I do remember Judge Real asking us what it meant when it came down to him the second time. I keep a six-inch-thick unabridged dictionary in my office just so I can read his opinions and understand the words he's using. Very good. Thank you, Your Honors. Okay. Rebuttal? Yes, Your Honors. When counsel says that a de novo review is different than an arbitrary and capricious review because the judge just looks at the record and whatever's in the record, that's what she looks at, that doesn't really hold any water because the fact of the matter is we're limited to the record that was made during the administrative appeals. And the judge raised it. That's all the plaintiff is responding to is whether the objections to his claim made during the administrative appeals. He's not responding to something else that he doesn't know that they're complaining about. That's not it. It's the difference between a self-interested claims administrator who may very well be the insurance company that's financing the disability payments who is making the determination, and our case law draws a specific distinction, as you know, in how we defer to a self-interested claims determination under those circumstances versus what I think I understood your opponent to be saying. Here we have a completely neutral fact finder, a federal district court judge sitting in a bench trial, reviewing all the evidence that you brought before her and making a de novo review of whether or not, as a matter of the definition of disability under this policy, your client qualifies for permanent disability. That's a very different process. Yes, it is, but I'm not talking about the conflict of interest issues. What I'm saying is that, and our case law supports, and the Ninth Circuit case law supports my argument, too. There's Booten, and there's Saffon, and they all say that you must tell the reason for the denial of a claim, and the specific reason that you must do that is so that the claimant has an opportunity to present evidence on that issue. As a matter of fact- You had a trial. I mean, you could have submitted any additional evidence that you wanted her to consider, couldn't you? We got a tentative ruling with that new basis for denying the claim two days before she made her decision, or three days before she made her decision. At the time we were arguing, I asked her for an opportunity to present that evidence because I had no idea she was going to raise that issue, and she said, no, she can make a decision without the new evidence. Well, the new evidence was evidence that his condition made it impossible for him to work at any occupation, and I wasn't allowed to- The whole reason for denying his claim through the first and the second administrative appeals was because there was no objective evidence of his condition, and it was not objective evidence of his disability or his inability to work. It was objective evidence of his physical condition. In one of the letters, if you look at ER 65 at the bottom, it says, disabilities due to a sickness or injury, which are determined by credential, are primarily based on self-reported symptoms, have a limited pay period during their lifetime. Now, there's no provision like that in the policy, but they just threw that out for whatever reason. I don't even know. But they're talking about the physical condition of a person. You need objective evidence of the physical condition, and that's what we strove to give him, and we gave him tons of that evidence, and we gave him plenty of opinions from plenty of doctors saying he couldn't work at any occupation. Dr. Dawson said he can't work at any occupation. Now, Dr. Cooper or Cooperman, whatever his name is, he gave an opinion saying that this man could work for 30 hours a week in a sedentary job, but he's got a degenerative condition that will continue to degenerate. After he wrote that opinion, they then granted him any occupation disability benefits, and it wasn't until seven months later, and probably I think it was close to three years after Cooperman wrote the report, that they withdrew the benefits, and they never had a doctor review those records before they withdrew it. And the reason they withdrew the benefits was because he didn't have objective evidence of a physical condition, and it was not because he didn't present objective evidence of his inability to work. As a matter of fact, during the first appeal, Mr. Berner raised the issue in his briefs, I believe it was, that my client could have gone through a functional capacity evaluation, and this court specifically said, well, why didn't you tell him that before? I asked them in three letters, or two letters, excuse me, what more evidence are you looking for, and they never bothered to respond. Now, I don't know what a claimant is supposed to do when they come up with a new reason, and you're never told what the reason is until two days before the judgment comes out. With regard to Dr. Marion, Dr. Marion wrote, that's in ER 102, there is no significant herniated disc disease, spinal cord compression, or nerve root compression. Now, he never examined the man. All he did was review the records, and the records show that at C4-5, there is a, and this can be found at ER 391. At C4-5, there is a five to six millimeter herniated nucleus pulposus with moderate encroachment on the subarachnoid space. There is acquired canal stenosis with extensive compression on the cervical cord, which is depressed in moderately severe encroachment on the fifth nerve roots bilaterally at the neural foramina. Peripherally, there is mild to moderate encroachment on the sixth nerve roots bilaterally in the neural foramina. Six, seven, peripherally, there is mild encroachment on the seventh nerve roots bilaterally in the neural foramina. And then it goes on. Then there's, after that, there's a report showing a central herniated disc ridge at C4-5, a herniated disc that's at 67. At 140, there's an MRI scan central truing disc at C4-5, impeding on the fifth nerve root bilaterally. We got herniated disc pinching on his nerves in his neck, pinching on his nerves in his back, and anybody familiar with a pinched nerve with a herniated disc is going to know that that can be disabling. Now, if they wanted evidence, additional evidence, they could have responded to my letters, and they never did. As a matter of fact, they offered a third appeal, and in the third appeal I asked for Dr. Merian's report, which I knew existed because they told me in the second denial of the, I'm sorry, the denial of the second appeal. I asked for Dr. Merian's report, and I asked him, what more do you want us to show you? They never bothered to respond to the letter. They never even bothered to decide the appeal. They just left the whole thing hanging. And we filed the lawsuit because they never, they didn't decide the appeal within the 45 days. If you look at the evidence, Dr. Merian denies that there's any problems, you know, any substantial problems. But if you look at what's supposed to be Dr. Fagan's report, and Dr. Fagan never wrote a thing, by the way. This is a summary of what he supposedly told somebody. But even Dr. Fagan recognized that there was a herniated disc in the neck pressing on the nerve. So Dr. Merian didn't even, they got reports all over the place, but none of them were dealing with my client. The court noted in the first decision that Prudential had changed its reasons for denying claims twice. And we have now a third reason. They never once told my client that his ability to work part-time is the reason that, and based on Dr. Cooperman's report that he can work part-time, is the reason for terminating his benefits. And the reason they never said that was because Dr. Cooperman's report was three years before they terminated his benefits, or two and a half years, whatever it was. They just, every time you turn around, they come up with a new reason. And I realize that we're not entitled to a full and fair review, and that, but certainly the court has to give us an opportunity when they come up with another reason to address that reason. And we're told that we don't have a right to that, to Dr. Merian's report, because based on the Midget case, but the Midget case has been rejected by the Ninth Circuit in a decision, a published decision by this court in Saloma. And we went, I think it was Mr. Berner was on that case. Well, I'm sorry, it wasn't Mr. Berner. Somebody else was on that case, and they took it up, and they asked for an in-bank hearing on that. And in-bank, based on that specific issue, that in Saloma they said there was an error because I never was shown the doctor's report, their final doctor's report. And the other side took it up and asked for an in-bank hearing on the grounds that that rule has been overruled, and that requiring them to give me the report had been overruled by the Midget case and the case that followed it. And this court said no, that one of the errors was they did give me the report, and they didn't give me the report in this case either until after the administrative appeals, until after a lawsuit was filed, at which time the record, of course, is closed, unless the court allows me to put in new evidence. And that was one of the reasons that this court originally reversed or commented upon, that they kept changing what they were requiring for him to prove disability. They, if you look at the, if you look at Dr. Fagan's, what's supposed to be Dr. Fagan's report, he says that my client can only do light keyboarding, and he said no repetitive constant hand movement and light keyboarding. And then he wrote, should be, then he wrote that he can be free with his hands. So, I mean, it contradicts itself right there. And I think if you read my comment there, it's this kind of gibberish that forms the kudzu of forensic medicine. I can interject. I don't mind hearing the argument, but I think you're way over your time, and I sort of feel like if we're going to let you argue at this length, that we should let the other side come back to argue further, too. I just didn't get where we were going with this, because you were no longer really just making a rebuttal argument. Okay. It's up to Judge Pregerson, who's presiding. I'll let you go on, because I like lawyers who are passionate in presiding their client. But we need to hear from the other side. Thank you, Your Honor. You heard what he said. What do you got to say? I'm sorry, did you want me to sit down now? Yeah, you have a seat. Yes, we do want you to sit. Oh, okay. We'll have Mr. Brenner. I'm sorry, can I just make one more comment? Okay, go ahead. If you find everything else is wrong with my case, there's one thing you cannot deny, that the judge applied the wrong test for disability. She required permanent disability. And it didn't slip out of her mouth. She wrote it, I think, three times, and she said it orally twice. She discounted one of the doctors, specifically one of the plaintiff's doctors' reports, said he's temporarily totally disabled. And she said, well, that doesn't mean anything, because he has to be permanently disabled. She specifically rejected that doctor's report. Thank you. Okay. Are you a member of this Mitchell firm? No. I'm with Wilson-Elser.  With Wilson-Elser, Moskowitz, Edelman, and Dicker. Wilson-Elser, not Mitchell-Silberberg. It was their plan that they were insured by Prudential, and our firm has represented Prudential as the actual defendant and appellant. There was a lot of passion in that argument, but I'm not sure that there were a lot of facts or any law. I think referring to Saloma or Saffon. There is evidence that he had these, you know, the discs were herniated, and they were pressing on the nerves that come out of the foramen and all that kind of stuff. And it's easy to say, well, there's no objective evidence. How do you measure pain? How do you know it's there? It's his own self-reporting. I mean, these arguments have been going on in courts for 100 years. And I agree with all the statements, Your Honor, and the facts, and so do the doctors who were referenced in the file. Dr. Fagan noted the reference to Dr. Fagan's comments to the claim examiner. All note the various 2002, 2003 MRIs, X-rays, and the herniated discs for degenerative disc disease. Dr. Marion also notices them and doesn't deny that any of those existed. He reviewed all those records. He just didn't find them to be significant. He didn't say there were no herniated discs. He didn't say that there was no degenerative disc changes. How come when he asked for medical reports, they didn't get them? Because under the law, as the appeal is done or after that level of appeal, and these are, as I said before, the Midget case and others, he's not entitled to them because otherwise it would be a continuous back and forth. He'd reply, then they'd do another medical review. They'd provide it to them, and they'd go back and forth. At that point, he was entitled to it after the administrative record was closed, and he was given the entire record. Well, why wasn't he given it before? It didn't exist before. Dr. Marion's review was done for the purpose of the second appeal. They sent it out to him as an independent physical medicine and rehabilitation specialist and said, look at this and tell us what you think. And then he came back and he said, here is everything I reviewed. He just reviewed pieces of paper, right? Correct. Written on them, right? He reviewed the medical record, plaintiff's medical record. He never saw the patient. No, he did not. He was a medical reviewer. And he works for the company. No, he's an outside physician. I know he's an outside, but he does a lot of business with them. I don't know what he has done for Prudential, but he does, I would assume that he does primarily insurance company reviews. Insurance companies, right. So he's not exactly an impartial guy. That is certainly a debatable question. Correct, correct. You get what you pay for, you know. So, I don't, you know. But the situation in this case is we're having. You don't have to worry about this case. If this case were an abuse of discretion decision and we weren't talking about how Judge Wynn determines her final decision on it, then we would be having a different conversation. When they had this, and I know that's a practice that exists quite frequently, and she sent out her tentative, was there a new issue raised in that? I don't believe it was a new issue. Well, what was the issue? She allowed us to provide briefing beforehand. When it came back down to her from the Ninth Circuit on the remand, it was assigned to Judge Wynn. We had scheduling conferences in front of her. She said, you know, most of the record is already developed, so just give me some supplemental briefing on things you want to point out. She then, after a couple of months of reviewing, she apparently spent a lot of time on the file, provided us with the tentative, which became, I don't know that there was. . . Well, there was some change, I think, between the tentative and her final decision because we had significant oral argument, as you can see from what was provided in the supplemental excerpts. But she went through. . . What was the new issue that came up? I don't think it was a new issue. What was the issue he's complaining about? I'm not exactly sure. The concept of self-reporting is the same thing as objective evidence, I think, as Your Honor has said. That's an issue that has almost become standard in every ERISA appeal that you see, whether what was objective, what can be required, what cannot be required. But what happened in this case is that Judge Winn did a review on her own from scratch, and she found evidence in the file. She weighed the credibility of the different doctors, whether they were workers' comp doctors, in-house doctors, or, as you might call them, a hired gun from an insurance company. She looked at all of their information. She found who she believed was more credible, and she gave us extensive findings of fact and conclusions of law. Eighteen pages. I mean, it details everything. It talks about all of the objective evidence, all the MRIs and when they were and what she found. And in her opinion at the end, she didn't find, and she quoted the correct definition of total disability and found that. And I believe that based on that, I don't think that there was any clear error in her decision. To the contrary, I think that she was right. Did you read that Abate case? I have read Abate. Arisa is pretty much all I do. So in the cases that plaintiff, that Mr. Fleischman, has been citing to. Did you like Abate? I think Abate was a fine decision, and obviously Supreme Court agreed, because most of the Glenn decision was, I won't say plagiarized, but was paraphrased from Abate. The Supreme Court affirmed. They affirmed it when they did Glenn, when they met life versus Glenn decision. Do you know who wrote Abate? I do not, Your Honor. Was it you? Yeah. I apologize for not being aware of that at this very moment. It was one of my few affirmances. And it is the law of the state. They really put the widow over the rack in that one. He was the doctor, you know. Okay. There are no other questions? No. Thank you, Your Honor. Time to quit. You know, you got to know when to quit. You don't want to hear any more of that? No. If I do, my clients will, I mean my colleagues, will, you know, you're way over your time. Okay. Sorry. But you made a good presentation, and we appreciate it. Thank you, Your Honor. Is your client in court? Yes. Okay. I don't think so. All right. Okay. Thank you. All rise. And we'll recess until 9 a.m. tomorrow morning. Thank you, Your Honor. Thank you, Your Honor.
judges: Pregerson, Gould, Tallman